Anna Mathieu, wife of Sanders Payton, Jr., died intestate on April 6, 1947, and shortly thereafter Henry Jones, claiming to be her child by a previous marriage and her sole heir, accepted her succession purely, simply, and unconditionally, and was recognized and sent into possession by the Civil District Court for the Parishs of Orleans. The entire estate amounted to $2,000 and consisted only of a lot of ground in Algiers, upon which there is a small house known as 1000 Odeon Street, which was her separate and paraphernal property inherited from her parents.
The matter before us is the suit of Sanders Payton, Jr., against Henry Jones, wherein plaintiff seeks to have annulled and set aside the judgment recognizing Henry Jones as the sole heir of Anna Mathieu. It is alleged that Henry Jones is not the lawful issue of the decedent, and that the collateral relatives of decedent, and Sanders Payton, Jr., as the surviving husband in community, are entitled to the property. In the alternative, plaintiff alleges that if the said judgment is not set aside or annulled, then he is entitled to recover from the defendant certain amounts due by the estate of Anna Mathieu, and judgment is prayed for accordingly.
Defendant filed two exceptions to the suit, which were referred to the merits by the court below. These exceptions have not been reurged before us, and we take it that they have been abandoned.
Defendant filed an answer which is equivalent to a general denial, and reconvened for rent allegedly due by Payton, who continued to occupy the property after Anna Mathieu's death.
There was judgment below dismissing Payton's main demand, but on the alternative demands he recovered $1,154.94. All rights of defendant to proceed for possession of the property were reserved to him. Defendant was allowed $234 on his reconventional demand for rent. This present appeal has been taken by Henry Jones. Payton did not appeal, nor did he answer Jones' appeal.
In his first alternative demand, Payton alleged that decedent, during 1942, borrowed $1,100 and secured her indebtedness by giving a mortgage on the property, and that Payton, out of community funds, paid a portion of the mortgage indebtedness and is, therefore, entitled to recover his community one-half of the aggregate of such payments from Jones.
The evidence discloses that on May 14, 1942, the decedent mortgaged the property to secure a note of that date for $1,100 payable to the order of herself and by her endorsed, with interest at the rate of seven per cent, and payable at the rate of $16 per month. Payton testified that Anna Mathieu borrowed this money specifically for the purpose of making improvements to 1000 Odeon Street, which consisted of a new roof, shoring, now siding, and replacement of sills and flooring, all of which cost the sum of $1,100. His testimony is uncontradicted. Jones admitted that a new roof and siding had been placed on the house, but stated that he does not remember the year in which the work was done. We have no doubt that the decedent made the loan for the purposes mentioned, and that the proceeds of the loan paid for the work. *Page 633 
Payton, up to decedent's demise, and out of his wages as a longshoreman, all of which fell into the community of acquets and gains then existing between himself and Anna Mathieu, whom he married on July 27, 1936, paid $569.88 on account of the mortgage indebtedness. The trial judge allowed him one-half thereof, or $284.94, as his community share, and we think that such allowance was correct.
The payment by the husband of notes of the wife, secured by mortgage on her separate property, constitutes the husband her creditor to the amount of such payment. Aiken v. Robinson, 52 La. Ann. 925, 27 So. 134, 529. The heirs, by the fact alone of the simple acceptance of a succession without benefit of inventory, contract the obligation to discharge all debts of such succession, to whatever sum they may amount. Rev.Civ. Code art. 1423.
The next claim is that Payton, out of his own separate funds, during the year 1938, extended certain monies for other capital additions and improvements. The evidence shows that Payton was a veteran and during 1936 received his World War I adjusted service bonds from the Treasury Department in the sum of $767.37. His uncontradicted testimony is that out of their proceeds the improvements and additions were paid for.
During 1938, Anna Mathieu had a bathroom added to the property, with plumbing and a cesspool. The work was done by Harold Belcher, who testified that he performed the services in 1938 and that his charge amounted to $278, which was paid by Payton. Defendant admitted that a new bathroom with the plumbing and cesspool had been added to the house, and we have little difficulty, therefore, in finding that the $278 was expended in improving decedent's house, and that the cost was paid out of Payton's separate funds. There is no doubt that these betterments enhanced its value, at least to the extent of their costs. However, the court below was in error in allowing $485 for this item, and unquestionably it should be reduced to the sum of $278. Defendant's counsel, in contending for a disallowance of this item, argues that under our law it is the duty of the husband to furnish his wife with a home, and that whereas plaintiff lived in the house with Anna Mathieu he should bear the costs of the improvements.
We see no merit in this contention. It is well settled that improvements erected during marriage by one spouse on the separate property of the other belong to the owner of the soil, subject only to the duty of paying to the other spouse, at the dissolution of the community, the enhanced value of the property resulting therefrom. Rev.Civ. Code art. 2408; Succession of Singer, 208 La. 463, 23 So.2d 184; Succession of Meteye, 113 La. 1012, 37 So. 909; Succession of Webre, 49 La. Ann. 1491, 22 So. 390.
In Courrege v. Colgin, 51 La. Ann. 1069, 25 So. 942, the Supreme Court held that where expenses are incurred by which improvements of a substantial character are added to the wife's separate estate, it is liable to the husband for the indebtedness incurred for such improvements.
The third claim is for the expenses of Anna Mathieu's funeral. The decedent held two policies of insurance issued by the Unity Industrial Life Insurance Company. One was a life policy for $200 in which Sanders Payton was designated as beneficiary; the other was a burial policy, with Sanders Payton as beneficiary, stipulating that Anna Mathieu would receive a funeral and certain mortuary services to the value of $200, provided that the official undertaker of the insurer would be selected to conduct the funeral.
The record indicates that Willis Funeral Home was the official undertaker, but Payton declined to allow that establishment to handle the burial, because of statements he had heard from other persons that this official undertaker rendered unsatisfactory services, and that he wanted his wife buried by the Gertrude Geddes Funeral Home so that she would be "put away like she should."
The funeral bill was $584.25. Payton surrendered to Gertrude Geddes the two policies, with the understanding that the undertaker would collect the proceeds and *Page 634 
apply the same to the funeral bill. However, by virtue of a provision in the burial policy, to the effect that if the burial was not handled by the official undertaker then only sixty per cent of the face of the policy, $120, would be paid to the beneficiary, the insurer made a deduction of $80 and paid to Gertrude Geddes the sum of $321.32, being $200 for the life policy, $120 on the burial policy, and $1.32 representing a return of prepaid premiums on the latter. Payton paid the difference of the undertaker's bill in cash.
Defendant's counsel argues that it was Payton's duty, in view of the burial policy, to have had Anna Mathieu buried by the official undertaker, so that there would have been no funeral charges. It seems to us that Payton's reasons for not wanting to do business with the official undertaker were sound, and desiring to have his wife buried in a manner which he believed to be fitting, he placed her burial in charge of an undertaker in whom he had confidence. It is true that the funeral amounted to more than the one provided for in the burial policy, but we do not believe that Payton was unreasonable in giving her the more expensive interment. The only limitation placed on the amount of funeral charges, to our knowledge, is to be found in articles 3193 and 3194 of the Revised Civil Code, to the effect that the judge can never allow at the expense of an insolvent estate, on any account whatever, more than $200 for all the expenses occasioned by the interment of the deceased.
There is nothing indicating that Anna Mathieu's estate is insolvent. Her property, the house on Odeon Street, according to affidavits in the record, is valued at $2,000 The only indebtedness shown is the claims of Payton, and perhaps a small amount due on the mortgage hereinabove discussed.
We do not believe that the surviving spouse or the heirs of a decedent are privileged to burden his estate with exorbitant burial charges, but in determining whether such charges are reasonable it seems to us that the living standards, both financial and social, of the parties should be given consideration. Payton and Anna Mathieu were colored persons who lived together in the Odeon Street house, which was owned by the wife, and in view of the apparent pride taken in their home, manifested by their modernizing it, we can surmise that theirs was a fair standard of living for colored persons. In' the present times, too, we can only conclude that the price of funerals, as well as that of all other services and commodities, has risen considerably because of the depreciated dollar. Payton wanted his wife "put away like she should." We do not believe the bill was out of proportion with the value of the estate.
Also to be taken into consideration is the fact that the policy called for a $200 burial, for which defendant must be given full credit, notwithstanding the $80 deduction made by the insurance company. It was Payton's choice not to deal with the official undertaker, and we believe that he, and not Anna Mathieu's estate should bear the loss of $80.
Defendant's counsel also contends that Payton voluntarily remitted his claim for the undertaker's bill, pointing to the following testimony of plaintiff:
"Q. Now, why was it that you contracted for a funeral expense of $584.25? A. Because I wanted her to be put away decent, and after he made his account of what it would cost to have this thing done, I just went and had it done. I didn't care to have no return of any money, I wanted her to be put away like she should. * * *"
We do not believe that Payton's words should be construed as evidencing a remission of the debt. The Revised Civil Code, in treating "Of the Manner in Which Obligations May Be Extinguished," provides in article 2130 that an obligation may be extinguished by voluntary remission. The remission may be either conventional, when it is expressly granted to the debtor by a creditor having a capacity to alienate, or tacitly, when the creditor voluntarily surrenders to his debtor the original title under private act which establishes the obligation. Rev.Civ. Code art. 2199. *Page 635 
We fail to see how Payton's words describing his mental attitude at the time the burial was contracted for, that he did not "care to have no return of any money," can possibly be construed as a remission of his claim against defendant.
Deeply imbedded in our law is the old axiom that no one is presumed to have renounced a right unless it clearly appears that he intended to so do, and there appears nothing to indicate that Payton irrevocably intended to waive the claim.
The $200 life policy in which plaintiff was named as beneficiary formed no part of the insured's estate, but belonged exclusively to him. Nulsen v. Herndon, 176 La. 1097,147 So. 359, 88 A.L.R. 236. Payton must be given credit for this $200. In addition thereto, he paid $182.93 in cash, and the amount due him for the funeral charges is $382.93, and not $385, which was the amount fixed by the lower court.
Funeral expenses created after death are not community obligations, and are to be charged against the decedent's separate property, or his net one-half of the community estate. See Succession of Lewis, La. App., 12 So.2d 7, and cases therein cited.
The trial judge allowed defendant, as reconvenor, $234 for rent, which was computed up to the date of the trial, but defendant asserts that the amount should be augmented so as to include rent to the date of the finality of our decree. Whether we would have the right to increase the amount so as to include accruals post-dating the trial is a question that need not be resolved, as there is nothing in the record disclosing that Payton occupied the property after the trial, or that he is living there at the present time, or that he owes any more than the amount fixed by the court.
For the reasons assigned, the judgment appealed from is amended so as to decrease the allowance to Sanders Payton, Jr., to the sum of $945.87, and as so amended, and in all other respects, it is affirmed; all costs are to be paid by plaintiff-appellee.
Amended and affirmed.